RICH (NORTON v.). See Case No. 10,352.

## Case No. 11,760.

### RICH v. PARROTT et al.

[1 Cliff. 55.] [1]

Circuit Court, D. Massachusetts. May Term, 1858.[2]

CHARTER-PARTY—BALLAST—HEAVY GOODS—RULE OF CONSTRUCTION.

1. Where in a charter-party it was covenanted that the charterers should furnish the vessel at Calcutta with a full cargo, and, among other articles of freight, "sufficient saltpetre or its equivalent for ballast," held, that ballast paying freight was the object of the latter proviso, and that, in order to constitute a compliance with the charter-party, the goods must be of the description of heavy goods usually purchased for exportation at Calcutta; should be suitable and proper for ballasting the ship named in the contract, having reference to the intended voyage and stipulated cargo.

2. Words are to be construed according to their primary acceptation, unless from the context of the instrument, and the intention of the parties to be collected from it, they appear to be used in a different sense, or unless in their primary signification they are incapable of being carried into effect; in which latter case, the first rule is the intention of the parties to be collected from the words of the instrument and its subject-matter.

3. Whether a suit claiming damages for the non-fulfilment of a charter-party, on account of a refusal to furnish a specified cargo, can be sustained in admiralty, or whether the party must resort to his personal action for damages as in other cases, quære.

[Cited in Scott v. The Ira Chaffee, 2 Fed. 405; The J. F. Warner, 22 Fed. 345.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Appeal in admiralty from a decree of the district court. In September, 1858, the libellant [Abraham Rich] let to freight the ship

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]
[2] [Affirming Case No. 11,761.]

Martha to the respondents [William F. Parrott and others] for a voyage from Boston to Calcutta and back; and the respondents, as charterers, engaged to provide the vessel at Calcutta with a full cargo for Boston. The cargo was to consist of such goods as would load the vessel full, and to a fair and reasonable draft, with the stipulation that the article of linseed was not to exceed one half the cargo, and with a further proviso that sufficient saltpetre or its equivalent should be furnished for ballast, and as much loose stowage as the master of the vessel should require. Loose stowage was to consist of pockets of linseed, ginger, bundles of twine, or loose gunny-bags, each or either, at the option of the agent of the respondents at Calcutta. Fifteen dollars per ton was to be paid for whole packages, and seven dollars and fifty cents for broken stowage; libellant to victual and man the ship, and furnish suitable dunnage for the cargo. Forty running lay days were to be allowed at Calcutta from the time the ship was ready to receive cargo. When the ship arrived at Calcutta, the British government had prohibited the exportation of saltpetre in American vessels, and consequently none was furnished. Other goods, however, were supplied, and linseed comprised less than half the cargo; and the ship was loaded, and brought eleven hundred and eighty-three tons safely home. She also brought stone ballast amounting to ninety-two tons. As damage for the non-fulfilment of the charter-party, the libellant, as owner, claimed a sum equal to the amount the ship would have earned in freight if saltpetre or its equivalent had been furnished to supply the place of the stone ballast. No claim for freight on any of the goods brought home was made, and saltpetre could not have been shipped at Calcutta without a forfeiture of both the vessel and the goods. A libel in personam was filed in the district court, claiming damages to the amount of two thousand dollars, and setting forth as the cause of action the non-fulfilment of the charter-party, by the refusal of the agent of the respondents at Calcutta to furnish sufficient saltpetre or its equivalent for ballast. The claim was urged upon the ground that the failure to furnish such heavy goods as freight made it necessary that the master should retain and bring home the stone ballast, and thus diminished to that extent the capacity of the ship to receive goods and earn freight on the voyage. To this it was in effect replied, that the stone ballast was unnecessary, because the cargo which was supplied and brought home contained in itself a sufficient quantity and proportion of heavy goods, if they had been properly stowed, to have served for ballast for the ship. In the district court the defence was sustained, and the libel dismissed. [Case No. 11,761.]

R. H. Dana, Jr., and S. C. Guild, for libellant.

C. P. Curtis, Jr., for respondents.

CLIFFORD, Circuit Justice. Subject to certain limitations, which will presently be stated, the libellant was bound to receive as freight such goods as the agent of the respondents should offer. These limitations were, that the goods should be such as, in the language of the charter-party, would fill the vessel full, and load her to a fair and reasonable draft; that sufficient saltpetre or its equivalent should be furnished for ballast, and that linseed should not exceed one half the cargo. "Saltpetre or its equivalent" are the words of the charter-party, and it becomes important to ascertain in what sense the word "equivalent" was used by the parties. Words are to be construed according to their primary acceptation, unless from the context of the instrument, and the intention of the parties to be collected from it, they appear to be used in a different sense, or unless in their primary signification they are incapable of being carried into effect. What is meant by an equivalent for ballast is nowhere defined in the charter-party; and yet, according to its plain terms, it was at the option of the respondents to furnish sufficient saltpetre or its equivalent for ballast, leaving it to be otherwise ascertained what goods or merchandise constituted such an equivalent for that purpose. Any article of goods or merchandise, such as is usually shipped from that port, paying equal freight, and having equal weight for ballast, may be said to be an equivalent for saltpetre within the strict primary sense of the words employed in the charter-party; and it would be difficult to say that any approximation to equality in those respects short of that standard would fulfil their strict primary meaning. That construction cannot be admitted, as upon that view of the charter-party compliance would have been impossible. Articles of the same value and weight as saltpetre cannot in general be obtained for those purposes at Calcutta, if, indeed, they may elsewhere, and heavier goods are seldom to be purchased in that market, and then only in small quantities. When it was ascertained that saltpetre was prohibited, the master of the ship, who was the agent of the owner, made request for rice and sugar to supply its place; and it seems to be admitted, that if those articles, or either of them, had been furnished, it would have constituted a compliance with the contract; although the case shows, what is known to be the fact, that those articles respectively are lighter than saltpetre. A case is therefore presented in which it becomes necessary to resort to construction, not only because the words employed are indefinite and undefined, but for the additional reason, that upon their strict primary signification the contract itself could not be carried into effect. In such a case the primary rule is the intention of the parties, which must be collected from the words of the instrument and the subject-matter to which it relates. An exact equivalent cannot usually, if ever, be obtained in that market; and therefore it

would be unreasonable to suppose that such requirement was within the contemplation of either party. Ballast paying freight was the object of the stipulation; and, in order to constitute a compliance with the charter-party, the goods must be of the description of heavy goods usually purchased for exportation in Calcutta, and suitable and proper for ballasting the ship named in the contract, having reference to the stipulated cargo and voyage. Under the charter-party it was at the option of the respondents to furnish as cargo such goods as they pleased, subject in this behalf to the limitation, that a proportion sufficient to ballast the ship should be heavy goods suitable and proper for that purpose; so that the whole question turns upon the issuable fact, whether or not the cargo furnished, or offered to be furnished, contained in itself sufficient heavy goods suitable and proper for ballasting the ship during her homeward voyage. At common law the matter in dispute would be a question of fact for the jury, and in the admiralty it must be determined by the court from the evidence. Both parties have introduced evidence upon this point, and it is conflicting. Strong doubt is entertained whether the evidence justifies the conclusion that the cargo as stowed and shipped did furnish such weight for ballast as would have authorized the master to dispense altogether with the stone ballast used and brought home. Many of the witnesses are of the opinion that less would have answered every valuable purpose; and it clearly appears, from the testimony on both sides, that a considerable quantity of the heavy goods were placed between decks, and that some of the light goods were stowed in the lower hold. After having determined to retain a portion of the stone as ballast during the return voyage, that manner of stowing the goods might be allowable; but, on the hypothesis assumed in the charter-party, that the cargo should serve as ballast, it showed great want of good judgment, for which the respondents are not responsible, as the master was the agent of the owner; and as such it was his duty, not the respondents', to know the construction and capacity of the ship, and the proportion of heavy or light goods wanted, and where and in what manner they ought to be stowed to carry into effect the intention of the parties. Heavy goods, such as linseed, hides, indigo, and castor-oil, were furnished, shipped, and brought home; and the parties agree that the agent of the respondents was ready to furnish as much linseed as should be required of him by the master, not exceeding one half the cargo. Readiness to furnish, and an offer to that effect, under the circumstances of this case, are equivalent to furnishing, so far as the present question is concerned; as it was incumbent upon the master, as the agent of the owner, to make known to the respondents or their agent in Calcutta what proportions and quantities of the several articles furnished would

be necessary to load and ballast the ship; and if he omitted to make requisition, and unnecessarily retained the stone ballast when the goods offered were suitable and proper to supply its place, the consequences of such neglect must fall upon his principal, and not upon the shipper. Such were the views of the district judge, and they appear to be correct. On this point the weight of the evidence is clearly on the side of the respondents, and it is decisive of the cause upon its merits. Five witnesses called by the respondents testify that the cargo shipped, if it had been properly stowed by placing the heavy goods at the bottom, would have sufficiently ballasted the ship without the stone. These witnesses have had much experience in the Calcutta trade, either as merchants or shipmasters, and are also well acquainted with the ship. Opposing testimony was introduced by the libellant, coming, however, to some extent, from persons whose means of knowledge, either respecting the ship or the trade in which she was employed, are far less satisfactory. Others based the opinion that stone ballast was necessary with that cargo too exclusively upon the ground that the build of the ship made her crank; and several appear to assume, what is contrary to the theory of the charter-party, that there is no article of merchandise among the goods usually exported from Calcutta, which is suitable and proper as a substitute for stone ballast in a loaded ship of that description, except saltpetre, or perhaps sugar. Some ships are crank when unloaded, and stiff when filled with cargo; and the testimony introduced tends strongly to show that such was the character of the ship in question. "Sufficient saltpetre or its equivalent," for ballast, are the words of the contract, and not a doubt is entertained from the evidence that a cargo made up of the articles shipped in this case, arranged within the restrictions of the charter-party, in suitable proportions of heavy goods to light, if properly stowed by placing the heavy goods at the bottom, would afford sufficient and convenient ballast for a ship of that description, and save all necessity of the stone for that purpose. Additional linseed was offered, and if the proportion of heavy goods already furnished had been insufficient, it should have been accepted to the extent that was allowable under the charter-party, which would have been ample and more than ample for the purpose; and if the master had been of the opinion that the whole amount so allowable would not be sufficient, a proportion of the stone equal to the space usually occupied by dunnage might well have been retained without any departure either from the spirit or letter of the charter-party. Whether the stone retained filled more or less space than is usually occupied for dunnage it is not necessary to determine, as it is clear that if it did it was the fault of the master, who admitted in his testimony that he removed a portion of it because it occupied space in which he could

put goods; and it is satisfactorily shown, that the residue, or so much of it as occupied any such space, might have been safely removed if the cargo had been properly stowed, and he had performed his duty in making proper requisition upon the agent of the respondents, or had accepted the additional linseed when it was offered. These views lead necessarily to the conclusion that the libellant is not entitled to recover, and render any further consideration of the other points of the defence unnecessary.

A question of jurisdiction, however, arises in this case, which perhaps ought not to be passed over without remark. Contracts of affreightment, where the goods are actually shipped, are undoubtedly within the jurisdiction of the admiralty. They constitute a lien upon the ship, which may be enforced either in rem or in personam. No claim is made in the case for any amount of freight earned, or for any deterioration of the goods shipped. All that part of the claim, it may be presumed, was settled and adjusted between the parties when the ship returned, as no such claim is set forth in the libel. More doubt is entertained whether a suit, claiming damage for the non-fulfilment of a charter-party on account of a refusal to furnish a stipulated cargo, can be sustained in the admiralty under the recent decisions of the supreme court. It was expressly determined in Freeman v. Buckingham, 18 How. [59 U. S.] 168, that, under the maritime law of the United States, the vessel is bound to the cargo and the cargo to the vessel for the performance of a contract of affreightment, and that the law creates no lien on the vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made and the cargo shipped under it. In Vandewater v. Mills, 19 How. [60 U. S.] 90, the supreme court deny that any treatise on maritime law has authorized the conclusion, that every contract by the owner or master of a vessel for the future employment of it hypothecates the vessel for its performance, and say, in effect, that the lien or privilege is founded on the rule of the maritime law, and stands upon the doctrine that the obligation is mutual and reciprocal, and in such cases that the merchandise is bound to the vessel for freight and charges, and the vessel to the cargo. But this duty of the vessel, to the performance of which the law binds her by hypothecation, is to deliver the cargo at the time and place stipulated in the bill of lading or charter-party, without injury or deterioration. If the cargo be not placed on board, it is not bound to the vessel, and the vessel cannot be in default for the non-delivery of goods never received on board. Consequently if the master or owner refuses to perform his contract, or for any other reason the ship does not receive cargo, and depart on her voyage according to the contract, the charterer has no privilege or maritime lien on the ship for such breach of contract by the owners, but must resort to his personal action for damages as in other cases. See Cox v. Murray [Case No. 3,304]. Whether this case might or might not be distinguished from the principle there laid down, it is not necessary now to determine. No question of jurisdiction was made at the argument, and therefore the point will not be decided at the present time, as the judgment, in any event, must be for the respondents. The decree of the district court is therefore affirmed with costs.